CUSHMAN C. HALL v. STATE OF NEBRASKA.

FILED JUNE 3, 1916.    No. 19451.

1. Constitutional Law: SALE: CHOLERA SERUM. Section 2, ch. 170, Laws 1915, providing: "No person, firm, or corporation shall sell, barter, exchange, carry, give away, ship or deliver for shipment any anti-hog cholera serum or virus within the state of Nebraska unless such person, firm, or corporation shall first hold an uncanceled, unexpired United States government veterinary license, issued by the United States Department of Agriculture, and a permit from the Live Stock Sanitary Board"—is an attempted restriction on the power of the citizen to buy and sell anti-hog cholera serum, and is unconstitutional, for the reason that any person has the right to adopt and follow any lawful industrial pursuit which is not injurious to the community.

2. Monopolies: ACT IN RESTRAINT OF TRADE. Such act, in effect, gives a monopoly to the serum-manufacturing plant, because it is the plant that is licensed under the federal act, and section 2 of the Nebraska act gives the right to sell, barter, exchange, carry, or give away to the person holding an unexpired and uncanceled United States Veterinary license issued by the United States Department of Agriculture; such person being the only person allowed to hold a permit from the Live Stock Sanitary Board.

3. ——: ——: ——. It is provided in 37 U. S. St. at Large, ch. 145, pp. 832, 833: "That from and after July 1, 1913, it shall be unlawful for any person, firm, or corporation to prepare, sell, barter, or exchange, * * * or to ship or deliver for shipment from one state or territory * * * to any other state or territory * * * any worthless, contaminated, dangerous, or harmful virus, serum, toxin, or analogous product intended

Hall v. State.

for use in the treatment of domestic animals." It is also provided that no person, firm, or corporation shall prepare, barter, exchange or ship such virus, serum or toxin unless and until the same shall have been prepared under and in compliance with regulations prescribed by the secretary of agriculture and at an establishment holding an unsuspended and unrevoked license issued by the secretary of agriculture. As it is only an establishment of this kind that is permitted such a license, section 2 of the Nebraska act confines the right to sell, barter, exchange, carry, give away, ship or deliver for shipment such anti-hog cholera serum to the *plant* holding such license, and no *person* may have such permit under the Nebraska act, for only a *plant* is licensed.

4. Constitutional Law: ACT IN RESTRAINT OF TRADE. Section 9, ch. 170, Laws 1915, provides: "No person, firm, or corporation shall give or accept a rebate or commission on any anti-hog cholera serum or virus that is sold or offered for sale within the state of Nebraska"—and also provides a punishment for the violation of the act. This is an additional bar preventing the farmer from purchasing serum with which to treat his own hogs, and preventing the veterinary surgeon from purchasing serum with which to treat the hogs belonging to his employers. Because of the bar of this provision, section 9 of the state law is unconstitutional and void.

ERROR to the district court for Douglas county : CHARLES LESLIE, JUDGE. *Reversed and dismissed.*

*Arthur F. Mullen,* for plaintiff in error.

*Willis E. Reed, Attorney General,* and *Charles S. Roe, contra.*

HAMER, J.

The plaintiff in error, Cushman C. Hall, seeks to review the judgment of the district court for Douglas county. He was fined $50 and costs. The first count in the information charges the unlawful selling by the defendant on the 6th day of August, 1915, to Frank C. Mitchell of 500 cubic centimeters of anti-hog cholera serum for the sum of $12; that the defendant at the time of the sale did not hold an uncanceled, unexpired United States veterinary license issued by the United States Department of Agriculture, and did not hold a permit from the Live Stock Sanitary

Board of the state of Nebraska to sell anti-hog cholera serum; that said defendant had not given a bond to the said sanitary board in the sum of $5,000 prior to the sale of the said serum; and that said defendant unlawfully and knowingly sold said serum without having complied with any of the provisions of chapter 170, Laws 1915. The second count charges that at the time of the said sale there was no price marked on the bottle containing said serum, and therefore that the sale was unlawful and in violation of the provisions of said chapter. The third count charges the receipt by the said defendant of a rebate of $1 paid by the said Mitchell, and that the same was so received by said defendant wilfully, knowingly, and unlawfully. The three offenses charged are all alleged to arise out of the same transaction. The defendant demurred to each count in the information, and each demurrer was overruled. At the conclusion of the introduction of the evidence, the defendant moved that the court find him not guilty. This motion was overruled.

It is claimed by the defendant that the district court erred in holding that the law under which the prosecution is brought is constitutional. Laws 1915, ch. 170. In the brief of the attorney general it is said that "The state is compelled to concede that the act contains provisions that are inconsistent, and that the law as passed does not answer satisfactorily the purpose for which it was enacted."

Section 2 of the state law is as follows: "No person, firm, or corporation shall sell, barter, exchange, carry, give away, ship or deliver for shipment any anti-hog cholera serum or virus within the state of Nebraska unless such person, firm, or corporation shall first hold an uncanceled, unexpired United States government veterinary license, issued by the United States Department of Agriculture, and a permit from the Live Stock Sanitary Board." Laws 1915, ch. 170.

The Department of Agriculture, realizing the losses that were resulting to the hog raisers of the country from the promiscuous manufacture and distribution of anti-hog cholera serum, secured the enactment of a law intended

to regulate the preparation, sale and distribution of such serum. The act provides that after July 1, 1913, it shall be unlawful to prepare, sell, barter or exchange in the District of Columbia, or in the Territories, or in any place under the jurisdiction of the United States, any worthless, contaminated, dangerous, or harmful virus, serum, toxin, or analogous product intended for use in the treatment of domestic animals; also, that no person, firm, or corporation shall prepare, sell, barter, exchange, or ship any virus, serum, toxin, or analogous product manufactured within the United States and intended for use in the treatment of domestic animals *unless and until* the said virus, serum, toxin, or analogous product shall have been prepared under and in compliance with regulations prescribed by the Secretary of Agriculture at an establishment holding an unsuspended and unrevoked license issued by the Secretary of Agriculture. The act further prohibits the importation into the United States of any worthless, contaminated, dangerous, or harmful virus, serum, toxin, or analogous product. The Secretary of Agriculture is authorized to cause the Bureau of Animal Industry to examine and inspect all viruses, serums, and analogous products imported into the United States, or offered for importation, and the same are denied entry if it appears that they are worthless, dangerous or harmful. The Secretary of Agriculture is also authorized to prepare such rules and regulations as may be necessary to prevent the preparation, sale, barter, exchange, or shipment of any such worthless, dangerous, or harmful virus, serum, or toxin. He is also authorized to issue permits for the importation into the United States of viruses, serums, toxins, and analogous products for use in the treatment of domestic animals. Each license is to be issued on condition that the licensee shall permit the inspection of such establishment, and of such product and the preparation of the same, and the Secretary of Agriculture is authorized to suspend or revoke any permit or license issued under authority of the act after an opportunity for hearing has been granted to the licensee or importer; also,

any officer, agent, or employee of the Department of Agriculture is authorized by the Secretary of Agriculture to enter and inspect any establishment licensed under the act where any virus, serum, toxin, or analogous product is prepared for sale, barter, exchange, or shipment. Violation of the act is to be deemed a misdemeanor, and conviction is to be punished by a fine not exceeding $1000, or imprisonment not exceeding one year. 37 U. S. St. at Large, ch. 145, pp. 832, 833.

It will be seen that the act provides that plants shall be licensed, and that they may not prepare this serum for shipment unless they are licensed. A United States veterinary license does not appear to have been provided for the use of a *person,* but for the use of manufacturers of the serum. *The license is to the plant.* The Nebraska act seeks to give to those manufacturers the exclusive right to sell the serum, and it denies to the citizen of Nebraska the right to sell it. The manufacturing plant, under the federal act, gets a United States veterinary license issued by the Department of Agriculture. The provision of section 2 is that there shall be no permit from the Live Stock Sanitary Board, except to one who holds a license from the United States Department of Agriculture. The effect of this is that no person may have a license, and a license can only be issued to the manufacturing plant, which alone may sell. This provision contained in section 2 creates a monopoly, because it confines the sale of the serum to the plant which manufactures it.

The attorney general says: We are compelled to concede that the law as passed contains inconsistent provisions as already pointed out, and we do not argue for the approval of the law in its present form. He then declines to "discuss particularly the constitutional questions so extensively considered in defendant's brief." The license issued is to those engaged in the manufacture of serum. The federal permit is designated a "United States government veterinary license." We do not understand that the federal government undertakes to regulate those

who sell serum after it has been disposed of by the manufacturer. The act of 1915 undertakes to prevent the citizens of this state from buying and selling serum unless they have a United States government veterinary license. As the United States government does not issue such a license, except to the manufacturer, the effect of the Nebraska act is that no one has a right to sell serum except those who manufacture it. This creates a monopoly. Of necessity it must be wrong. The legislature does not have the power to deprive its citizens of the right to sell serums that are up to the standards prescribed by law and which have been manufactured in establishments approved by the federal government.

Section 3, art. I of the Constitution, provides: "No person shall be deprived of life, liberty, or property, without due process of law."

Section 9, ch. 170, Laws 1915, provides, among other things: "No person, firm, or corporation shall give or accept a rebate or commission on any anti-hog cholera serum or virus that is sold or offered for sale within the state of Nebraska. Any person, firm, or corporation, violating any of the provisions of this section shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined in any sum, not less than ten dollars ($10) and not more than five hundred dollars ($500)."

This is an additional bar preventing the farmer or veterinary surgeon from purchasing serum with which to treat hogs.

"While every man has a right to require that his own controversies shall be judged by the same rules which are applied in the controversies of his neighbors, the whole community is also entitled, at all times, to demand the protection of the ancient principles which shield private rights against arbitrary interference, even though such interference may be under a rule impartial in its operation." Cooley, Constitutional Limitations (7th ed.) p. 504.

A person living under the protection of the United States government has the right to adopt and follow any

Hall v. State.

lawful industrial pursuit, not injurious to the community, which he may see fit, and, as incident to this, the right to labor or employ labor, make contracts in respect thereto upon such terms as may be agreed upon by the parties, and to inherit, purchase, lease, sell and convey property of all kinds. The enjoyment or deprivation of these rights and privileges constitutes the essential difference between liberty and oppression. These principles have been fully recognized and announced in many decisions of the supreme court of the United States, and other courts. *Yick Wo v. Hopkins,* 118 U. S. 356.

In *Braceville Coal Co. v. People,* 147 Ill. 66, 22 L. R. A. 340, the question of the right to enter into contracts by which labor may be performed in such a way as the laborer may deem beneficial to others to employ such labor was considered. The legislature passed an act requiring a regular payment of wages by certain classes of corporations. The court held that this was arbitrary and unconstitutional; that the employer and employee had a right to make lawful contracts regarding the time of payment. In discussing the right to enter into contracts, the court said: "The fundamental principle upon which liberty is based, in free and enlightened government, is equality under the law of the land. It has accordingly been everywhere held that liberty, as that term is used in the Constitution, means not only freedom of the citizen from servitude and restraint, but is deemed to embrace the right of every man to be free in the use of his powers and faculties, and to adopt and pursue such avocation or calling as he may choose, subject only to the restraints necessary to secure the common welfare." *Commonwealth v. Perry,* 155 Mass. 117, 14 L. R. A. 325; *People v. Gillson,* 109 N. Y. 389.

In *Commonwealth v. Perry, supra,* it was said: "Article I, sec. 10 of the Constitution of the United States, provides, among other things, that no state shall pass any 'law impairing the obligation of contracts.' The right to acquire, possess, and protect property includes the right to make

reasonable contracts, which shall be under the protection of the law.    *    *    *    The right to employ weavers, and to make proper contracts with them, is therefore protected by our Constitution; and a statute which forbids the making of such contracts, or attempts to nullify them, or impair the obligation of them, violates fundamental principles of right which are expressly recognized in our Constitution."

*Adair v. United States,* 208 U. S. 161, and *State v. Sperry & Hutchinson Co.,* 94 Neb. 785, support the views here. expressed.    The act creates a combination in restraint of trade.    It permits the manufacturers of serum to monopolize the entire business of selling it in the state. It also makes it unlawful for any other person than the makers of serum to sell or vend it.

If this law is permitted to stand, it means that the serum plants in Nebraska which have received a United States government veterinary license have a monopoly of the right to sell anti-hog cholera serum. The law not only seeks to give these serum plants a monopoly on the right to sell serum, but it attempts to fix the price by requiring the manufactures to mark on the outside of the bottle the price at which it is sold, and then provides further that it is a misdemeanor for any one to give or accept a rebate or commission on any serum sold.    It creates a monopoly of the right to sell, and then requires those who have the monopoly to fix the price, and then it makes it unlawful for them to change the price.

It is provided in section 1, art. XIV of Amendments to the Constitution of the United States: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

We are of the opinion that the second and ninth sections of the act are unconstitutional, and that there is no law justifying the imposition of the fine sought to be imposed.

The judgment of the district court is reversed, the case dismissed, and plaintiff in error discharged.

REVERSED AND DISMISSED.

LETTON and ROSE, JJ., dissent.

SEDGWICK, J., dissenting.

The defendant was found guilty of selling anti-hog cholera serum without complying with the statute. Laws 1915, ch. 170. He has brought the case to this court, and insists that the statute is unconstitutional and wholly void. The majority opinion appears to so hold. In the first paragraph of the syllabus it is said that section 2 of the act is void, "for the reason that any person has the right to adopt and follow any lawful industrial pursuit which is not injurious to the community." The second paragraph of the syllabus says: "Such act," meaning, I take it, the above cited statute, "in effect, gives a monopoly to the serum manufacturing plant." And the third paragraph says: "No person may have such permit under the Nebraska act, for only a plant is licensed." In the opinion it is said: "The Nebraska act seeks to give to those manufacturers the exclusive right to sell the serum.   *   *   * A license can only be issued to the manufacturing plant, which alone may sell. This provision contained in section 2 creates a monopoly, because it confines the sale of the serum to the plant which manufactures it." This idea is repeated several times in the opinion, and it seems that the intention is to hold the entire act void because of the construction that is put upon section 2 of the act. The attorney general concedes that section 2 of the act, construed literally, is inconsistent with other provisions of the act, and contends that the section should be construed in the light of the other provisions, and so render the meaning plain as the legislature intended. This sugges-

tion of the attorney general is not discussed nor even mentioned in the opinion, and so it appears that the whole act is rendered unconstitutional by the use of the word "and," instead of the word "or," in one section of the act, although in a similar provision in another section (section 9) the legislature has clearly expressed its meaning, and has even used the proper conjunction in so doing.

Congress had undertaken to regulate the manufacture and sale of "virus, serum, toxin, or analogus product" in the territories and in interstate commerce. The object of our statute was to regulate the manufacture and sale of the serum within the state. The intention was to require a state license in those cases that were not, and under the provisions of the Constitution could not be, regulated by the federal government, and so this statute was enacted to supplement the act of congress. It was intended that any one properly authorized by the act of congress to manufacture and sell the serum should be recognized by this statute as authorized to do so, and that other persons might be authorized to manufacture and sell the same within the state. The intention of the legislature was to recognize those who were duly authorized by act of congress as being fully authorized, and to require others who were not governed by that act to obtain a license from the state.

It is stated in the title of the act that the purpose of the act is: "To empower the State Veterinarian, Deputy State Veterinarian, through the Live Stock Sanitary Board, to permit the manufacture, sale, distribution, and to report on application of anti-hog cholera serum and virus, as provided in this act." The first section of the act prohibits the sale, etc., of the serum "as hereinafter provided," and by section 9 of the act no one is to sell the serum without the license of the state, or the Department of Agriculture, or both. Section 6 of the act provides that section 1, which is the section which makes it unlawful to sell the serum, except as provided in the act, "shall not apply to persons, firms, or corporations who

have complied fully with the regulations and orders of the Live Stock Sanitary Board, and shall have received a permit to sell serum or virus in this state." This is a direct provision that it shall not be unlawful for persons who have a permit from the state to "sell, barter, exchange, carry, give away, ship or deliver for shipment, any anti-hog cholera serum or virus within the state of Nebraska." Section 2 of the act, which is now held to invalidate the whole act, provides that no person, firm, or corporation shall sell, etc., the serum, within this state unless he is authorized by the act of congress *and* has a permit from the state. The purpose of the act and all of its provisions construed together indicate that this section should be construed as though it read, "Any person, firm, or corporation who shall hold a government license and any person who shall hold a permit from the state may sell," etc. This meaning would be given to the statute if the conjunction "or" had been used in place of the conjunction "and," and where it is so manifest that that is the intention, such intention being plainly expressed, as we have seen in the title and other sections of the act, it is always held permissible to read the conjunction "or" in place of the conjunction "and." There can be no possible doubt that this was the intention and meaning of the legislature.

That the manufacture and sale of this serum in this state is a proper subject of regulation within the police power of the state cannot be doubted, and the act of the legislature, which appears to be necessary and proper legislation in all other respects, ought not to be held invalid for the inadvertent use of the wrong conjunction in one of the sections. The fourth paragraph of the syllabus says that section 9 of the state law "is an additional bar preventing the farmer from purchasing serum with which to treat his own hogs, and preventing the veterinary surgeon from purchasing serum with which to treat the hogs belonging to his employers," and "because of the bar" section 9 is void. I do not think that this section calls

for such discussion and criticism; but, as the whole act is declared void, and it is doubtful if effective regulation of the subject is possible under the majority opinion, I will not discuss this ninth section.