David E. MORRILL, Petitioner,

v.

Harvey WOLLMAN, Governor of the State of South Dakota, Respondent.

No. 12580.

Supreme Court of South Dakota.

Argued Oct. 18, 1978.

Decided Nov. 7, 1978.

Rehearing Denied Nov. 13, 1978.

Bruce A. Hubbard of Morrill, Hansen & Hubbard, Sturgis, for petitioner; James S. Nelson of Costello, Porter, Hill, Nelson, Heisterkamp & Bushnell, Rapid City, on the brief.

Charles B. Kornmann, Sp. Asst. Atty. Gen., Aberdeen, for respondent.

DUNN, Justice.

This case involves an original proceeding before this court regarding a dispute over a seat on the Board of Regents. On January 30, 1975, petitioner Morrill was appointed to the Board of Regents for a six-year term. At the time of his appointment, Morrill was a resident of Meade County, South Dakota. On August 28, 1978, Morrill moved his residence to Pennington County and subsequently filed an application for a writ of prohibition. The application was filed in anticipation that respondent Wollman, the Governor of South Dakota, was going to declare a vacancy as a result of the change of residence and name a replacement for Morrill. Such a declaration would be declared pursuant to SDCL 13–49–2, which discusses residency in a county in which a state educational institution is not located as a qualification for the Board of Regents.

Wollman filed an answer to the application for a writ of prohibition and counterclaimed for a writ of quo warranto challenging Morrill's right to hold office. In the counterclaim, Wollman alleges that as a result of Morrill's change of residence Morrill forfeited his seat thereby creating a vacancy and the Governor of South Dakota is required by statute to fill vacancies on the Board of Regents. Wollman further alleges that since the change of residence Morrill has been and is now wilfully usurping, intruding into and unlawfully holding and exercising his office without any right, authority, or legal justification therefor.

On October 3, 1978, we declined jurisdiction over the application for a writ of prohibition and exercised jurisdiction over the counterclaim for a writ of quo warranto. A full hearing before the Court was held during regular session on October 18, 1978.

The first issue before us is whether the residency qualification for members of the Board of Regents is a continuing requirement. The statute in question is SDCL 13–49–2 and reads in pertinent part as follows:

"The regents who are regular members shall be persons of probity and wisdom and selected from among the best known citizens, residents of different portions of the state, none of whom shall reside in the county in which any state educational institution is located, all of whom shall not be members of the same political party."

Morrill argues that this provision sets only the initial qualifications for selection to the Board of Regents and, since it is not a continuing requirement, does not govern the creation of a vacancy. Wollman argues that the provision's qualifications constitute a continuing requirement for regents.

The obvious difference of opinion regarding the effect of a change in residency on a vacancy prompts us to ascertain the intent of the legislature. The wording of

the provision appears to dictate that regular members be selected from counties in which state educational institutions are not located. Our interpretation of the provision, however, requires the conclusion that such a qualification cannot be limited merely to the time of selection but must be continuing in nature during the term following the particular regent's selection. Any other conclusion would be totally illogical and render the provisions nugatory. Counsel for Morrill admitted during oral argument that the legislative intent was to proscribe members of the Board of Regents from serving while residing in an institutional county. The legislature has repeatedly considered bills to remove the requirement that regents not reside in counties in which state educational institutions are located, and it has consistently expressed a desire to maintain the requirement by refusing to adopt such legislation. If the legislature prescribes qualifications for a particular appointive office, those qualifications must be deemed to be continuing unless the legislature expressly declares otherwise.[1] Therefore, we hold that the residency requirement provided in SDCL 13–49–2 is a continuing qualification for members of the Board of Regents.

The second issue presented is whether the residency requirement in SDCL 13–49–2 violates the equal protection of the law guarantees prescribed in the Fourteenth Amendment of the United States Constitution and Article VI, § 18 of the South Dakota Constitution.[2] We are first met with a challenge to Morrill's standing to question the constitutionality of a statute under which he was appointed, served and paid. In *Collins v. Siewert*,

1939, 66 S.D. 477, 285 N.W. 518, this court held that "[w]here a party has accepted the benefits of a law, he cannot question its validity." We still deem this to be a sound policy of the law where the petitioner's challenge only involves his personal right to hold a public office. Morrill, however, attacks the constitutionality on the grounds that the law discriminates against a substantial portion of the citizens of the state who live within institutional counties. This raises a question of public importance as opposed to a personal right to hold office; it is reasonably capable of repetition if not clarified; and strict adherence to the *Collins* decision would probably proscribe any method of appellate review. Thus, we deem it appropriate to consider the constitutional issue raised by Morrill.

Our review of the constitutionality of any statute carries with it a presumption of the validity of the statute, and we will not hold a statute unconstitutional unless its violation of constitutional dictates is "so plain and palpable to admit of no reasonable doubt." *McDonald v. School Bd. of Yankton*, 1976, S.D., 246 N.W.2d 93, 97, quoting *In re Hinesley*, 1967, 82 S.D. 552, 150 N.W.2d 834. The two-part test utilized when a statute is called into question because of an alleged denial of equal protection is as follows: (1) whether the statute sets up arbitrary classifications among various persons subject to it and (2) whether there is a rational relationship between the classification and some legitimate legislative purpose. *City of Aberdeen v. Meidinger*, 1975, S.D., 233 N.W.2d 331.

The statutory classification in question is based upon residency in counties containing state educational institutions, i.

---

1. For example, SDCL 3–7–1 provides for a State Police Civil Service Commission consisting of five members, "not more than three of whom shall be members of the same political party *at the time of their appointment*, and not more than three of whom shall reside *at the time of their appointment* in the same congressional district." (emphasis added)

2. United States Constitution, Amendment Fourteen, reads as follows:
"No state shall make or enforce any law which shall abridge the privileges or immuni-

ties of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."
South Dakota Constitution, Article VI, § 18, reads as follows:
"No law shall be passed granting to any citizen, class of citizens or corporation, privileges or immunities which upon the same terms shall not equally belong to all citizens or corporations."

e., individuals residing in such counties may not serve on the Board of Regents. Viewing this classification in terms of the traditional test of reasonableness as opposed to the strict scrutiny test,[3] the fact that the state has distinguished between citizens in such a manner does not render the classification unreasonable or arbitrary. Morrill argues that the use of county boundaries is totally arbitrary because they are not viable dividing lines in a contemporary social and economic context. The fact that the legislature chose county boundaries instead of some other more precise means of classification does not concern us. Perhaps we in our collective wisdom could conjure up some more expedient and rational means of accomplishing the legislative purpose, but this is not our function. The wisdom, policy, necessity, expediency and methods of carrying out the legislative purpose are for the legislature. We are only concerned with the constitutionality of an act, and, as long as there is a rational relationship between the legislative purpose and the classifications, we will not intervene. *McDonald v. School Bd. of Yankton,* supra; *Behrns v. Burke,* 1975, S.D., 229 N.W.2d 86. The legislature has examined this statute on several occasions when all of the shortcomings of using county boundaries as a criterion have been presented. No change has been made, and the court's venture into this area would be trespassing on legislative authority. Accordingly, we are not compelled to conclude that the statute sets up arbitrary classifications among the state's citizens.

The stated objective or legislative purpose for the residency requirement in the statute has been discussed for years and its merits debated extensively. If appointees to the Board of Regents could reside in counties containing state educational institutions, considerable political pressure would be brought to bear on the Governor to have each of those institutional counties represented. The statute further attempts to maintain the objectivity and integrity of the Board of Regents and to insulate the Board to the extent possible from localized pressures by preventing the appointment of institutional representatives and by protecting against overzealous appointees becoming champions of institutions located in the counties from which they are appointed. The statute also minimizes the temptation that would exist for a regent in an institutional county to become involved in the daily administrative functions of the institution. We find that these considerations constitute a legitimate legislative purpose, and we conclude that there is a rational relationship between this legitimate legislative purpose and the classification based upon residency in counties containing state educational institutions.

We can find no violation of constitutional dictates "so plain and palpable to admit of no reasonable doubt." Based upon the foregoing conclusions, we hold that the residency requirement in SDCL 13–49–2 does not violate the equal protection of the law guarantees prescribed in the Fourteenth Amendment of the United States Constitution and Article VI, § 18 of the South Dakota Constitution.

Accordingly, a judgment shall issue declaring a vacancy on the Board of Regents.

MORGAN, J., and HALL and WILDS, Circuit Judges, concur.

ZASTROW, J., dissents.

HALL, Circuit Judge, sitting for WOLLMAN, C. J., and WILDS, Circuit Judge, sitting for PORTER, J., disqualified.

ZASTROW, Justice (dissenting).

I agree with the majority opinion that the residency requirements of SDCL 13–49–2 are not limited to the time of selection but are in fact qualification requirements which continue during the term of each member of the Board of Regents.

I agree that Regent Morrill's standing to challenge the constitutionality should not be prohibited under the rationale of *Collins v. Siewert,* 1939, 66 S.D. 477, 285 N.W. 518,

---

**3.** At best, sitting on the Board of Regents is a privilege granted by the legislature and could not be deemed to be a fundamental right or suspect classification which calls for strict judicial scrutiny requiring a compelling state interest to justify the classification. See, *Behrns v. Burke,* 1975, S.D., 229 N.W.2d 86, 88, n. 7.

because the constitutionality of the statute in question is of such great interest to the general public that it is within the prerogative of this Court to decide this matter. See *Anderson v. Kennedy*, 1978, S.D., 264 N.W.2d 714.

However, having agreed to decide the constitutionality of the statute, the majority reaches what I consider to be an erroneous conclusion. It is my opinion that the residency requirement of SDCL 13–49–2 establishes an arbitrary classification which rests upon a basis of difference which has no fair and substantial relation to the purpose of the legislation; and, therefore, is a violation of the equal protection clause of the Fourteenth Amendment of the United States Constitution (*Reed v. Reed*, 1971, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225), and Article VI, § 18 of the South Dakota Constitution (*City of Aberdeen v. Meidinger*, 1975, S.D., 233 N.W.2d 331).[1]

In *Meidinger*, this Court stated that "Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made." 233 N.W.2d at 334. In *Meidinger* the court found that there was no legitimate legislative purpose for the classification, and thus obviously there could be no rational relationship between the classification and the non-existent legislative purpose.

It is not my intent to indicate that the legislature may not prescribe qualifications for the office; that it can set qualifications which have a recognized rational basis, such as age, integrity, training or residency is well established. *Harper v. Virginia State Bd. of Elections*, 1966, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169. However, when it seeks to employ a classification of those who meet the prescribed qualifications, the classification must be non-discriminatory and meet the equal protection requirement that it be based upon a *realistic and sub-*

*stantial difference* having a reasonable relationship to the purposes sought to be accomplished by the legislation. *Quaker City Cab Co. v. Commonwealth of Pennsylvania*, 1928, 277 U.S. 389, 48 S.Ct. 553, 72 L.Ed. 927. There seems to be little question that the nonresidency requirement of SDCL 13–49–2 sets up a classification which must satisfy the equal protection requirement.

First, we must determine what is the legislative purpose of the nonresidency classification. The majority opinion declares that the legislature's purpose was (1) to avoid the political pressure upon the governor to select regents from each of the institutional counties; (2) to insulate the Board from localized pressure by preventing appointment of institutional representatives; (3) to protect appointees from becoming champions of institutions located in their own counties; and (4) to minimize regents from interfering in the daily administrative functions of a local institution. The respondent, Governor Wollman suggests a further purpose, i. e., that the socio-economic pressures upon a regent follows county boundaries.

This Court said in *Behrns v. Burke*, 1975, S.D., 229 N.W.2d 86, that although we will not substitute "[our] judgment for that of the legislature *regarding the wisdom of the statutory purpose* —it is an examination by this court to ensure that the *persons affected by a statute are those that should be reached to achieve the desired legislative ends.*" 229 N.W.2d at 89. In other words, the court will accept any legitimate legislative purpose without substituting its wisdom for the legislature's.[2] But the court must then continue on and must examine and determine whether the basis of the classification of the citizens into eligibles (i. e., those residing without an institutional county) and ineligibles (i. e., those residing within an institutional county) bears a real and substantial difference having a reasonable relationship to the purposes sought to be accomplished by the legislation. *Reed v.*

1. I agree with the majority that this is not a "fundamental interest" or a "suspect classification" based upon race, religion, national origin or sex which requires a strict scrutiny test; but is to be considered by the rational-relation test.

2. Except, of course, in situations such as *City of Aberdeen v. Meidinger*, 1975, S.D., 233 N.W.2d 331, where the court can find no legitimate legislative purposes.

*Reed,* supra. The majority simply concludes that the statute does exclude people who are subject to these influences and therefore accomplishes the legislative purpose. That is certainly true, but that is not enough.

Is it realistic, rational, and reasonable to exclude some 40% of the population of the state to accomplish those purposes? Is there a realistic, rational and reasonable difference that distinguishes 100,000 plus citizens residing within the confines of Minnehaha County and those well-known citizens within the city limits of Sioux Falls, but residing within the boundaries of Lincoln County? Are all these people so affected by the influences that they must be reached to achieve the desired legislative ends?

Is the statutory classification realistic, rational and reasonable if it excludes the citizens of Wall and Quinn, 50 to 60 miles from the School of Mines in Rapid City, because they may be subject to these influences but the residents of Piedmont, who are within a few miles of the School of Mines but just inside the Meade County line, are not? Certainly the economic life of the citizens of that community are much more dependent upon Rapid City and the state institution located there than those many citizens of distant eastern Pennington County.

Can it be said that there is reasonable and rational difference between a Butte County resident residing as near as five miles from the Black Hills State College campus, and a Nemo resident, forty miles distant from the campus, simply because of the location of the county boundaries?

The best example of the unrealistic and unreasonableness of the classification may involve residents of the city of Irene. The city is trisected by the boundaries of Clay, Turner and Yankton Counties. The eligibility of the otherwise qualified citizen to serve as a regent is simply decided by the side of the street upon which he lives, and none of the legislative purposes are reasonably served.

The examples can be made for each county and institution. Time and space prohibits the examination of each of the counties and institutions involved. But the real question in each instance is whether county boundaries, established in the late 1800's, provide a realistic, rational and reasonable basis for the classification of those persons otherwise qualified to be selected to the Board of Regents. In my opinion the answer is NO! The influences and pressures will be upon any member appointed to the Board of Regents. If the member is concerned, as he/she should be, about the future of higher education *in the state* the influences and pressures will not affect their vote. If the member lacks that concern and is susceptible to such influence and pressure it matters little where his county of residence is.

I would deny the writ of quo warranto and find that the provision of the statute requiring that a member of the Board of Regents "shall (not) reside in the county in which any state educational institution is located" is a violation of the equal protection clause of the Fourteenth Amendment of the United States Constitution and Article VI § 18 of the South Dakota Constitution.

Although, there are methods this Court could suggest which would result in more realistic classifications, that is not our function. It is the responsibility of the legislature to clearly identify the objectives of the qualifications and then establish the classifications upon real and substantial differences having a reasonable relationship to the objectives sought to be accomplished. It may be necessary for the legislature to address each institution and the socio-economic area surrounding it to establish the necessary classifications. It may be that one type of classification will not meet the legislative purposes sought when applied to each institution. However, the legislature should not be allowed to retain the present arbitrary and unconstitutional classifications because reasonable and rational classifications may be difficult to enact because of political considerations.